■ SANA SABBAGH, Appellant-Respondent, v PIERRE COPTI, Respondent-Appellant. [674 NYS2d 329] —Judgment, Supreme Court, New York County (Walter Tolub, J.), entered December 18, 1997, which granted plaintiff judgment annulling the parties' marriage upon the ground of defendant's fraud upon plaintiff in falsely promising to live in London after the parties' marriage, unanimously modified, on the law and the facts, to grant plaintiff an annulment on the additional ground that defendant had fraudulently misrepresented that he intended to have children with plaintiff, and otherwise affirmed, with costs payable to plaintiff.

Order, Supreme Court, New York County (Walter Tolub, J.), entered July 18, 1997, which, *inter alia*, granted plaintiff's motion to dismiss defendant's second affirmative defense of lack of personal jurisdiction over him, unanimously affirmed, with costs payable to plaintiff.

These appeals involve an action in which the plaintiff, a 38-year-old woman from a prominent Lebanese family, sought an annulment from the 45-year-old defendant after a brief, five-month childless marriage. The financial issues were resolved by an antenuptial agreement, which the trial court upheld. After a six-day jury trial, the court set aside that portion of the jury's unanimous verdict granting plaintiff an annulment on the ground of defendant's fraudulent promise to have children with her after their marriage. The court let stand the jury's finding that the defendant fraudulently promised to live in London after their marriage and granted plaintiff an annulment on that ground.*

While recognizing its obligation to "act warily lest overzeal-

---

* Although it could be argued that in a technical sense plaintiff is not an aggrieved party inasmuch as she was granted the annulment she sought, such argument is not raised by defendant and plaintiff's appeal should not be dismissed. In a matrimonial action, where important rights may turn on the grounds upon which a judgment is based, the nominally successful party might in a practical sense be aggrieved when one of the grounds is stricken (*Becker v Becker*, 36 NY2d 787).

ous enforcement of its duty to oversee the proper administration of justice leads it to overstep its bounds and 'unnecessarily interfere with the fact-finding function of the jury to a degree that amounts to an usurpation of the jury's duty' [citations omitted]" (*Nicastro v Park*, 113 AD2d 129, 133), the court concluded that there was "insufficient evidence to support the jury's finding that the defendant lied about wanting to have children."

We disagree with the trial court's evaluation of the evidence, which fully supports the jury's verdict that defendant fraudulently misled plaintiff with respect to his pre-marriage promise to have children. In particular, the court's finding that "the parties continued to engage in unprotected sexual relations up until the commencement of the action" is contrary to the overwhelming evidence from both plaintiff and others who might otherwise be sympathetic to defendant.

The parties met in April 1996 in Lebanon, where defendant lived and worked for a bank. Plaintiff lived in New York and wished to live in London after they married. They married in New York on October 4, 1996, when she was 37 and he was 44 years of age. Thereafter, they honeymooned in Europe for three months. Plaintiff had received a birth-control injection right before the marriage, which prevented conception through December 1996.

Plaintiff testified that beginning in January 1997, when the contraceptive injection wore off, she began reminding defendant of his promise to have children, but he put her off, claiming he was "under a lot of stress", and promising that as soon as he obtained a job with the "Arab Bank", which had offices in London, they would move to London and begin having children. Other than that, he refused to discuss the issue. When the Arab Bank employment contract arrived on or about February 12 or 13, 1997, defendant put it in a drawer and ignored it. Plaintiff testified that when she inquired why he was not acting on it, "[h]e told me, shut up, it's none of your business, and if you don't like it, leave".

On February 21, 1997, a night plaintiff remembered because "it changed my life", she again raised the issue of moving to London and having children. The couple was getting ready to attend a dinner given in their honor by a diplomat and had not spoken at all for two days. Defendant replied: "I don't love you, I don't want to stay married to you, I never intended to have children with you, and I never intended to go to London with you, and I'm not going tonight with you to that dinner."

Defendant's best friend for 11 years, and best man at the

wedding, testified that just days before the wedding he had a conversation with defendant regarding his plans to have children. "So he said he was willing to make that commitment in order for him to marry Sana and then 'minclouf,' which in Arabic means 'we'll see'." This witness confirmed plaintiff's version of defendant's statements during the argument the parties had on February 21, 1997. Referring to a conversation the witness had with defendant on February 24, 1997, he testified: "That was a Monday night, if I recall and Pierre called me at home and told me that Sana was in his office and in front of him called her lawyer and asked for the annulment papers. And I asked him, I said, why would she do that, what happened? And he said that they had a fight like a few days ago and he told her that he didn't love her, he didn't want to stay with her, he didn't want to go to London with her, he didn't want to have children with her. So she asked for the annulment papers."

A childhood friend of plaintiff testified that plaintiff, defendant and she were having dinner at a restaurant in Lebanon, in February 1997, when a pregnant woman sat down at a nearby table and the subject turned to having children: "Pierre got mad. And he actually answered that he didn't want no kids and he didn't want to talk about it."

Plaintiff testified that there were discussions through March 1997 as to what plaintiff and defendant should do about their deteriorating marriage: "And everyone agreed, namely Pierre, his brother, and his cousin that the situation could not continue and that the marriage should end."

As the result of another conversation on March 29, 1997, in which defendant agreed to give plaintiff an annulment, plaintiff and defendant went to a United States consular office in Damascus, Syria on April 1, 1997, where he signed an affidavit under the caption of this New York action, admitting service of "the summons and complaint for annulment in the within action", stating that he did not intend to interpose a defense and requesting that the action be placed on the undefended matrimonial calendar. According to the trial testimony of defendant's then attorney, defendant told him he wanted to have· an uncontested annulment and faxed him a signed document that read: "I authorize you to represent me with respect to the annulment in New York of my marriage with Sana Sabbagh. I consent to the annulment of this marriage".

Given the ample testimony regarding defendant's avoidance of any relations with plaintiff once her birth-control injection wore off and his avoidance of any discussions about having

children, his admissions that he never intended to have children were sufficiently corroborated (*see*, Domestic Relations Law § 144 [2]). Concerning whether his promise to have children was fraudulent, while there was no clear testimony from defendant regarding the parties' birth-control practices during the period after plaintiff's injection wore off, defendant did testify that the parties had "normal sexual relations" until March 31, 1997, the day before the summons and complaint in this action were served. However, the jury weighed the credibility of the witnesses and its outright rejection of defendant's testimony on this issue is hardly surprising in light of his questionable testimony elsewhere that he signed the affidavit consenting to the annulment because he believed his wife's explanation "that this document was a document ending a civil marriage in order to open the way to a religious marriage". The defendant, a PhD in economics from the Sorbonne and an international banker for 16 years, further testified that he did not read the affidavit he signed in Damascus and "had no idea what was in the document".

Under the circumstances, the jury's implicit finding that defendant's testimony lacked credibility is amply supported by the record. There was no basis for disturbing the jury's factual finding that defendant had fraudulently misrepresented his intention to have children with plaintiff and plaintiff is entitled to an annulment on both grounds.

We have considered defendant's appeal from the court's July 18, 1997 order striking his affirmative defense of lack of personal jurisdiction and find it without merit in light of the April 1, 1997 affidavit, signed in Damascus, in which he admitted service of process and stated that he did not intend to answer or interpose a defense. Concur—Ellerin, J. P., Nardelli, Rubin, Andrias and Saxe, JJ.